# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LARRY PANETTA,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO. 05-4511** |
| | : | |
| **SAP AMERICA, INC., et al.,** | : | |
| **Defendants.** | : | |

## <u>MEMORANDUM AND ORDER</u>

Stengel, J.                                                                 March 30, 2007

The plaintiff, Larry Panetta, worked for the defendant SAP America, Inc. from 1995 to 2004 as a Solutions Engineer.  From 1996 to 2003, Panetta spent a significant amount of his time on the United States Postal Service ("USPS") project.  Ultimately, on May 28, 2004, USPS executed a $14 million software licensing agreement with SAP and, as a result, Panetta received a bonus under SAP's 2004 Compensation Plan.  Panetta now contends that he should have received a commission for the USPS contract based upon any one of the annual Compensation Plans in effect prior to 2004.  The defendants disagree.  SAP and its defendant officers[1] have filed a motion for summary judgment and argue that Panetta's breach of contract and Pennsylvania Wage Payment and Collection claims fail because the only Compensation Plan that applied to the USPS contract is the 2004 Compensation Plan — the plan in effect when the contract was executed.  For the

---

[1] In addition to SAP, plaintiff named Matthew Iacoviello, Courtney Depeter, Patricia Lavan, Bill McDermott, and Terry Laudal as defendants.  The individual defendants are only party to plaintiff's Pennsylvania Wage Payment and Collection Law claim.

reasons set out below, I agree with the defendants and will grant the defendants' summary judgment motion and dismiss all claims against them.

I.    **BACKGROUND**[2]

Larry Panetta began working for SAP in 1995 as a Solutions Engineer.  In his role as a Solutions Engineer, he would support the sales representatives on a prospective client's account and perform demonstrations for the prospective client to show them how SAP software could address their needs.  Specifically, Panetta would present SAP's software capabilities to potential SAP software licensing customers in the areas of human resources and payroll.

While employed by SAP, Panetta received a base salary.  In 2004, Panetta's base salary was approximately $115,000.  In addition to his base salary, during the years of 1995 through 2003, Panetta was eligible to receive commissions pursuant to the terms of the annual Sales Compensation Plans.  In 2004, Panetta was eligible to receive a bonus pursuant to the terms of the 2004 Compensation Plan.  The terms of the 2004 Plan were substantially different than the 2000 through 2003 Plans.  For example, the 2003 Compensation Plan provided a Solutions Engineer with a commission based on a percentage of the total revenue generated by the software licensing deals the Solutions Engineer helped close in 2003.  Panetta electronically acknowledged receipt and

---

[2] The facts have been taken from the Second Amended Complaint, the defendants' statement of undisputed facts, and the parties' exhibits to their briefs. The facts are viewed in the light most favorable to the non-moving party, the plaintiff.

acceptance of the 2003 Plan.  The 2004 Compensation Plan, on the other hand, did away with the commission structure and adopted a "variable incentive plan."  The 2004 Plan rewarded Solutions Engineers for performance in addition to revenue, *i.e.*, it was much more subjective.  When Panetta received a copy of the 2004 Plan electronically, he did not accept the Plan but, nonetheless, continued to work for SAP until August 2004.  SAP issued a different Compensation Plan for each of the years between 2000-2004.  The 2000-2004 Compensation Plans were in effect from January 1st to December 31st of the corresponding year.

In 1996, Panetta began his involvement with the USPS account.  From 1996 to 1999, Panetta performed minimal work or "sporadic" demonstrations for USPS.  In mid-1999, USPS became a bona-fide sales opportunity for SAP and, at that point, Panetta's role in SAP's efforts to obtain the USPS contract increased dramatically.  From 1999 through the end of 2003, Panetta was the sole human resources and payroll Solutions Engineer that worked on the USPS deal.  He worked on the USPS account to the exclusion of other prospective clients and other potential sources of commissions.  Panetta completed his work on the USPS account in 2003, but for reasons outside the control of Panetta, the USPS licensing agreement was not executed until May 28, 2004.  The value of the USPS contract to SAP exceeded $14 million.  Panetta was paid a bonus for his work on the USPS contract under the terms of the 2004 Plan, which was significantly less than the commission amount he would have received under any of the

pre-2004 Plans.[3]

Panetta claims that he was not paid the proper commission for his efforts in closing the USPS contract and initiated this case against SAP to recover the missing amount. Panetta filed this case in the United States District Court for the Northern District of California.  The case was transferred to the Eastern District of Pennsylvania, see Panetta v. SAP America, Inc., No. C-05-01696, 2005 U.S. Dist. LEXIS 36813 (N.D. Cal. July 26, 2005), at which point Panetta amended his complaint to include claims under Pennsylvania law.  On April 19, 2006, the plaintiff filed a Second Amended Complaint with the following two counts: (1) breach of contract against SAP, and (2) violation of the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 Pa. Cons. Stat. § 260.1 et seq., against SAP and the Individual Defendants.[4]  On July 14, 2007, the defendants filed a Motion for Summary Judgment (Docket No. 48) on both counts and the plaintiff filed a response to the motion on July 28, 2006 (Docket No. 50).  In addition, the defendants filed a reply brief (Docket No. 56) and the plaintiff filed a sur-reply brief (Docket No. 59).

---

[3]Panetta states in his Second Amended Complaint that he received a bonus of approximately $12,400 for his work on the USPS deal and that he was entitled to a commission of approximately $250,000.  Based on Panetta's deposition testimony, the amount of the bonus he received from SAP in 2004 may have been in the range of $37,000.  The amount of the actual bonus and the amount Panetta believes he is entitled to under the pre-2004 Plans are irrelevant for the purposes of the motion for summary judgment.

[4]The new complaint contained class action allegations and asserted a claim for quantum meruit/unjust enrichment.  On June 22, 2006, this court granted the defendants' motion to strike the class action allegations and the claim for quantum meruit/unjust enrichment.  See Docket No. 46, 62.

4

## II.   LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

In this case, the defendants bear the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  While a plaintiff bears the burden of proof on a particular issue at trial, a defendant's initial Celotex burden can be met simply by pointing out to the court that there is an absence of evidence to support the plaintiff's case.  Id. at 325.  After the defendants have met their initial burden, the plaintiff's response, by affidavits or otherwise as provided in the rule, must set forth specific facts showing that there is a genuine issue for trial.  FED. R. CIV. P. 56(e).  That is, summary judgment is appropriate if the plaintiff fails to rebut the defendants' assertions by making a factual showing sufficient to establish the existence of an element essential to his case, and on which he will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.  Under Rule 56, the

court must view the evidence presented on the motion in the light most favorable to the plaintiff.  Liberty Lobby, Inc., 477 U.S. at 255.  If the plaintiff has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of material fact, then the court cannot credit the defendants' version of events against the plaintiff, even if the quantity of the defendants' evidence far outweighs that of the plaintiff's.  Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

**III.  DISCUSSION**

    A.    Breach of Contract Claim

        *1.    In General*

   According to the allegations in the complaint, the basis of the plaintiff's breach of contract claim is that SAP did not comply with the 2000 Compensation Plan when it determined Panetta's USPS commission.  Although the complaint delineates the 2000 Plan as the alleged controlling Plan, Panetta is not consistent with that assertion.  In his reply to the summary judgment motion, Panetta appears to argue that the 2003 Compensation Plan is the contract that SAP breached.  In his deposition, Panetta states that his commission should have been calculated under any of the pre-2004 "commission" Plans.  Given that the defendants' motion for summary judgment examines the breach of contract claim in the context of each of the Plans in effect from 2000 through 2004, this court will evaluate the sufficiency of Panetta's contract claim under the 2000, 2001, and

2003 Plans.[5]

SAP contends that it is entitled to summary judgment on the breach of contract claim because the pre-2004 Plans and the 2004 Plan unambiguously provide that their compensation incentives are limited to client contracts executed during the corresponding calendar year. Given that the USPS contract was executed in 2004, SAP argues that the terms of the 2004 Compensation Plan should govern the amount of Panetta's bonus for his work on the account.

A breach of contract claim in Pennsylvania must be established by demonstrating the following three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." Corestates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999).[6] SAP does not dispute for the purpose of its motion for summary judgment that the

---

[5]The plaintiff does not specifically argue that SAP breached the 2002 Plan and a complete copy of the 2002 Compensation Plan, with its pertinent attachment for Solutions Engineers, has not been produced to this court. Accordingly, a breach of contract claim based on the 2002 Plan will not be considered by this court.

[6]The 2003 and 2004 Compensation Plans state: "The provisions of the Plan shall be construed, administered and enforced according to applicable Federal law and the laws of the Commonwealth of Pennsylvania without regard to its conflict of law rules." Since the parties do not contest that Pennsylvania law applies here, I will examine the breach of contract claim under Pennsylvania law. See St. Paul Fire & Marine Ins. Co. v. Lewis, 935 F.2d 1428, 1431 n.3 (3d Cir. 1991) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)) (holding that a federal district court, sitting in diversity, must apply the choice-of-law rules of the state in which it sits); Churchill Corp. v. Third Century, Inc., 578 A.2d 532 (Pa. Super. Ct. 1990) (noting that Pennsylvania courts will uphold the parties' contractual choice of law provisions to the extent that the transaction is reasonably related to the chosen forum).

Compensation Plans were contracts.[7]  The question to be resolved, therefore, is whether Panetta has established a genuine issue of material fact regarding SAP's alleged breach of an obligation to Panetta under the Compensation Plans.  In order to answer that question, the court must first look to the language of the Plans to determine the rights and duties of the parties.

A recent Pennsylvania Supreme Court case summarized Pennsylvania's law regarding contract interpretation:

> The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties.  In cases of a written contract, the intent of the parties is the writing itself.  Under ordinary principles of contract interpretation, the agreement is to be construed against its drafter.  When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself.  When, however, an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances.  A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.  While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact.

Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co., 905 A.2d 462, 468-69 (Pa. 2006) (internal citations omitted).  "[A] writing must be interpreted as a whole, giving effect to all its provisions." Atlantic Richfield Co. v. Razumic, 390 A.2d 736, 739 (Pa. 1978).  In

---

[7]It is worth noting that the Plans gave SAP the right and discretion to modify the terms of the Plans at any time.  See Herbst v. Gen. Accident Ins. Co., No. 97-8085, 1999 U.S. Dist. LEXIS 15807, at *24-27 (E.D. Pa. Sept. 30, 1999) (granting summary judgment to employer on a WPCL bonus claim where employer's incentive program could be "unilaterally revised or canceled" by employer).  The plaintiff does not dispute this fact.  See Panetta Dep. at 82, 124-25.

this case, the terms of each of the Compensation Plans are unambiguous.  The Plans were in effect for one year and a Plan's compensation structure only applied to any new licensing agreements executed in that corresponding year.  Therefore, since the USPS contract was executed in 2004, I can conclude as a matter of law that the defendants' did not breach any of the pre-2004 Plans.

     2.    *2000 and 2001 Compensation Plans*

The 2000 Compensation Plan was in effect for Sales Year ("SY") 2000 — from January 1, 2000 through December 31, 2000.  Throughout the 2000 Plan, the objectives, incentives, and goals established for the SAP employees are defined within the time frame of SY 2000.  A Solutions Engineer could earn a commission under the Plan "based on the booked revenue from specific contracts and the level of participation during the sales cycle."  In the section of the Plan discussing commissions, the 2000 Plan states: "Commissions are not *earned* until the corresponding contract is booked in accordance with SAP contract booking policies . . . ."  SAP's contract booking policies explain revenue recognition for commission purposes and defines "booked revenue" as "all new net software licenses" which are "booked as revenue."  Finally, in the section of the 2000 Plan that explains "revenue splits" among Solutions Engineers, the Plan states (twice): "Commission eligibility is contingent on contract bookings."  Contract is defined in the 2000 Plan as "a legally binding agreement between SAP America, Inc. and a customer, under which SAP software functionality is licensed."  Contract booking is defined as a

9

"contract which has been officially entered into SAP's America's financial records." Therefore, taken each of these provisions together and viewing the Plan as a whole, the terms of the 2000 Plan are unambiguous as to when a commission is earned.[8]

A Solutions Engineer is entitled to a commission under the 2000 Plan for the "net" amount of a new, legally binding licensing agreement between SAP and a customer, which has been officially entered into SAP's financial records. The binding agreement must be entered into SAP's financial records by December 31, 2000 in order for a Solutions Engineer to receive credit for the contract under the 2000 Plan. After December 31, 2000, the Compensation Plan expires and its terms no longer apply. Since the software license contract between USPS and SAP was not in existence until 2004, the 2000 Plan has no application in the determination of Panetta's compensation for his efforts on the USPS contract. Accordingly, I find that SAP did not breach the 2000 Compensation Plan contract.

The 2001 Compensation Plan was in effect from January 1, 2001 to December 31, 2001 (SY 2001). The terms of the 2001 Plan, including its provisions on commissions, its definitions of contract and contract bookings, and SAP's modification rights, are

---

[8]The 2000 Plan also contained the following relevant provision regarding any changes to the Plan:

> SAP reserves the right to modify the Plan at any time. Notification of changes to the Plan may be in writing or by electronic mail to affected participants. Changes will be made to the Plan periodically. Changes may be made to revise goals and strategies, to correct bona fide errors in the Plan, and for any other legitimate business purpose. . . . The Plan describes the total commission and incentive for the employee. Any deviation, modification, or other changes are not in effect unless the Plan is modified and approved in writing by the GM/Senior Vice President(s) and the CEO or President.

substantially the same as the 2000 Plan.  Therefore, for the same reasons the 2000 Plan is

unambiguous as to when a commission is earned, so is the 2001 Plan.  And since the

USPS contract was not closed during the 2001 Plan's term, SAP breached no

compensation obligation to Panetta under the 2001 Plan with respect to the USPS

account.

> 3.    *2003 Compensation Plan*

The 2003 Compensation Plan for Solutions Engineers consists of two parts.  The

first part contains the general provisions of the Plan.  The second part, an attachment to

the Plan entitled "2003 Measures and Rewards Package," applies to Solutions Engineers

and details the terms and conditions for commissions and incentives.  The 2003 Plan was

effective for the period beginning January 1, 2003 and ending December 31, 2003.

The plaintiff argues that the 2003 Plan is ambiguous as to when a commission is

earned under the contract.  Panetta believes that the 2003 Plan can reasonably be

interpreted to allow a Solutions Engineer to collect a commission under the 2003 Plan

based solely on the work performed in that year.  Under Panetta's interpretation of the

2003 Plan, it does not matter when the customer's software license contract is executed, it

could be 2003 or 2013, *i.e.*, years after the annual Plan terminates.  As long as the

Solutions Engineer completes his work on a project in 2003, and the deal eventually

closes, Panetta believes the Solutions Engineer has earned his commission under the

terms of the 2003 Plan.

The language of the 2003 Plan with respect to when a commission is earned is unambiguous and Panetta's interpretation of the 2003 Plan is unpersuasive.  It is important to look at the language of the 2003 Plan in the context of duration.  The 2003 Plan was only in effect for one year.  For that one year period, each Solutions Engineer was assigned an individual quota for software license revenue.  Each level of revenue attainment has an associated commission rate and that commission "is *earned* at achievement of the appropriate revenue level."  In the chart that details the commission structure of the Software Engineers, the revenue levels are titled "*Annual* Software License Revenue Achieved."  The calculation of the annual revenue level includes "booked revenue, " which is "all new software licenses."  To allow into that equation the revenue from new licenses booked in future years, it would turn an annual policy into an indefinite policy.  Therefore, a Solutions Engineer could earn a commission under the 2003 Plan based only on the new software licenses entered into during the course of that calendar year.[9]  Since it is not disputed that the USPS contract was not closed during the 2003 Plan's term, I find that SAP breached no commission obligation to Panetta under the 2003 Plan with respect to the USPS project.

In addition, Panetta's claim that the defendants changed "without notice, consent or writing" the terms of the Compensation Plans in an effort to deprive him of earned

---

[9]This conclusion is supported by the definition of the words "contract booking" and "contract" in the 2003 Plan.  Contract booking is defined as a "contract which has been officially entered into SAP's America's financial records."  Contract is defined as "a legally binding agreement between SAP America, Inc. and a customer, under which SAP software functionality is licensed."

commissions carries no weight.  First, the 2003 Compensation Plan ended on December

31, 2003.  As a result, SAP had every right to issue a new Compensation Plan with new

terms or issue no Compensation Plan at all.  Second, SAP did not need to wait until the

end of the 2003 year to change the Compensation Plan.  SAP reserved the right under the

2003 Plan to modify or change the terms of the Plan, "at its sole discretion and at any

time."  SAP did not need the plaintiff's consent to change the terms of an expired or

existing Plan.  SAP was allowed to make such unilateral business decisions.  Finally, the

2004 Plan was sent to Panetta in writing and he acknowledges his receipt of the Plan.  See

Panetta Dep. at 59-60

        In light of the unambiguous terms of the pre-2004 Plans, the court does not need to

consider extrinsic evidence to interpret the Plans and determine when commissions were

earned under each of the Policies.  If I were to review such evidence, however, it supports

the conclusions I reached above regarding the non-application of the pre-2004

commission scheme to the USPS contract.  The plaintiff admits that the pre-2004 Plans

were only in effect during their corresponding calendar years, and that under the pre-2004

Plans, commissions were earned and paid in the year in which the customer contract was

executed.  See Panetta Dep. at 53-64.  See also Sunbeam Corp. v. Liberty Mutual Ins.

Co., 781 A.2d 1189, 1193 (Pa. 2001) (quoting  RESTATEMENT (SECOND) OF CONTRACTS §

202(5)) ("'[T]he manifestations of intention of the parties to a promise or agreement are

interpreted as consistent with each other and with any relevant course of performance

13

[and] course of dealing . . . .'").

       *4.    2004 Compensation Plan*

     Finally, the plaintiff tries to draw significance from the fact that he never agreed to the terms of the 2004 Plan.  He does not explain what his legal argument is and does not cite to any case law to support it.  To the extent Panetta is arguing that his nonacceptance of the 2004 Plan resulted in the continuation of the 2003 Plan, his argument fails.  The 2003 Plan ceased on December 31, 2003 pursuant to its unambiguous terms.  The 2004 Plan took effect on January 1, 2004 for all Solutions Engineers who satisfied the conditions precedent spelled out in the "Payment Condition" of the Plan.  One of those conditions included: "[T]he completion, signature on and submission of the Plan and any required attachments or schedules by a Plan Participant.  Execution of the Plan by a Plan Participant is an acknowledgment by the Plan Participant that he/she received, fully understands and agrees to the terms and conditions of the Plan."  Panetta's failure to accept the 2004 Plan excused SAP's performance, *i.e.*, the payment of a bonus, under the 2004 Plan.  See Davis v. Gov't Emples. Ins. Co., 775 A.2d 871, 874 (Pa. Super. Ct. 2001) ("[A] condition precedent may be defined as a condition which must occur before a duty to perform under a contract arises. . . . [A]n act or event designated in a contract will not be construed as constituting [a condition precedent] unless that clearly appears to have been the parties' intention.").[10]

---

    [10]Despite the condition precedent not being satisfied, SAP paid Panetta a bonus under the 2004 Plan for his work on the USPS contract.  See Panetta Dep. at 68-74.  I also note that even if plaintiff's

5.    *Plaintiff's Remaining Arguments*

Plaintiff claims that his managers, in particular Matthew Iacoviello, told him to do whatever it takes to close the USPS deal and when it closed he would be highly compensated.  See Panetta Dep. at 138-40.  These statements did not modify the applicable Compensation Plan at the time and it did not constitute any type of definitive promise.  First, all the Compensation Plans in question contained express language regarding the modification of the terms and strictly prohibited oral changes.  Second, Mr. Iacoviello's statements were couched in very general terms and they made no commitment to pay Panetta any particular amount of money or type of commission.  In any event, Mr. Iacoviello could have easily been referring to the annual Compensation Plan that was in effect at the time —one that would reward Panetta with a commission and one both parties knew would expire at the end of the year.

Finally, Panetta argues that the USPS contract was different due to the time commitment involved and the contract's value to SAP.  However, the USPS contract's uniqueness does not exempt it from the Compensation Plans.  The USPS contract was

---

unjust enrichment claims were permitted to go forward, they would fail.  In order to succeed under an unjust enrichment claim the plaintiff must show:

> that the defendant wrongfully secured or passively received a benefit that would be unconscionable for the recipient to retain without compensating the provider.  Similarly, to sustain a claim for unjust enrichment one must show that he conferred a benefit upon another, that the recipient realized the benefit and that retention of the benefit under the circumstances would be unjust.

Herbst , 1999 U.S. Dist. LEXIS 15807, at *26-27 (internal citations and quotations omitted).  SAP sufficiently compensated Panetta for any benefit he conferred upon it.  SAP paid Panetta a more than decent salary and commissions and bonuses under the terms of the annual Compensation Plans, even when it was not required to.

subject to the terms of the 2000-2004 Compensation Plans and, unfortunately for the plaintiff, the contract was executed under the 2004 Plan.

   *6. Conclusion*

   Plaintiff's belief that he should have been paid a commission for his work on the USPS contract under one of the pre-2004 Compensation Plans is not supported by the unambiguous language of the Plans.  According to the terms of the annual pre-2004 Plans and the plaintiff's own admissions regarding the course of performance under those Plans, commissions under those Plans were only due on software licensing contracts that were executed during the corresponding calendar year.  Therefore, SAP could not have breached the terms of its 2000, 2001, or 2003 Plans by failing to pay commissions under those Plans for the USPS contract that was executed in 2004.  The plaintiff may have been on the wrong end of an unfair business decision, but it was a business decision that did not breach a contract.

   B. Pennsylvania's Wage Payment and Collection Law

   As the Third Circuit recently stated in De Asencio v. Tyson Foods, Inc., 342 F.3d 301 (3d Cir. 2003): "WPCL does not create a right to compensation . . . . rather, it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages.  The contract between the parties governs in determining whether specific wages are earned." Id. at 309 (internal quotations and citations omitted).  See Banks Engineering Co. v. Polons, 697 A.2d 1020, 1024 (Pa. Super. Ct. 1997) (stating that the

WPCL "only establishes an employee's rights to enforce payment of . . . compensation to which an employee is otherwise entitled by the terms of an agreement").  Therefore, since the plaintiff's breach of contract claim for earned commission wages fails, his WPCL claim must fail as well.

**IV.    CONCLUSION**

For the reasons stated above, I will grant the defendants' motion for summary judgment in its entirety and dismiss both the plaintiff's breach of contract claim and WPCL claim with prejudice.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LARRY PANETTA,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v** | : | **NO. 05-4511** |
| | : | |
| **SAP AMERICA, INC., et al.,** | : | |
| **Defendants.** | : | |

## ORDER

**AND NOW**, this 30th day of March, 2007, upon consideration of Defendants'

Motion for Summary Judgment (Document No. 48), and the responses thereto, it is hereby

**ORDERED** that the motion is **GRANTED**.

The Clerk of Court shall mark this case **CLOSED** for statistical purposes.


BY THE COURT:

/S/ LAWRENCE F. STENGEL

_____

LAWRENCE F. STENGEL, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LARRY PANETTA,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v** | : | **NO. 05-4511** |
| | : | |
| **SAP AMERICA, INC., et al.,** | : | |
| **Defendants.** | : | |

## ORDER

**AND NOW**, this 30th day of March, 2007, in accordance with my Order granting the defendants' motion for summary judgment, and in accordance with Federal Rule of Civil Procedure 58, judgment is hereby entered in favor of the defendants and against the plaintiff.

BY THE COURT:

/S/ LAWRENCE F. STENGEL

_____

LAWRENCE F. STENGEL, J.